**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Janet Tannor, | No. CV-22-00040-TUC-RCC |
| Plaintiff, | **ORDER** |
| v. | |
| Banner Health, | |
| Defendant. | |

Pending before the Court is Defendant Banner Health's ("Defendant" or "Banner") Motion for Summary Judgment in this lawsuit alleging Banner violated the Americans with Disabilities Act ("ADA"). (Doc. 34.) This matter has been fully briefed. (Docs. 34–35, 41–42, 45.) For the following reasons, the Court will grant the Motion.

**I.     Factual Background**

On March 13, 2016, Plaintiff Janet Tannor began working for Defendant as a Registered Nurse Home Triage. (Defendant's Statement of Facts "DSOF," Doc. 35 at 1–2.) Plaintiff assisted patients remotely by reviewing their medical history and triaging their concerns over the phone. (*Id.* at 2.) She worked three shifts per week—a 12-hour shift from 5 p.m. to 5 a.m. on Fridays and Saturdays, and a 15-hour shift from 5 p.m. to 8 a.m. on Sundays. (*Id.* at 3.) On average, Plaintiff received from four to fifteen calls per shift. (*Id.* at 2.) Plaintiff was one of three home care triage nurses. (*Id.* at 3.) Defendant permitted Plaintiff to work at home and attend staff meetings virtually because she had provided

medical notes that limited her deskwork, walking, and driving. (*Id.* at 2–3.)

In November 2019, Defendant announced to staff that, because it was implementing new software, it would need to change the work schedule for home care triage nurses. (*Id.* at 3; Plaintiff's Statement of Facts "PSOF," Doc. 42 at 21.) Defendant reassigned Plaintiff's team to support only afterhours operations. (DSOF Doc. 35 at 2–3.) The new schedule resolved a gap in coverage, reduced the number of employees needed to cover each shift, allowed the triage team to centralize calls so they could efficiently serve patients in both Arizona and Colorado, and facilitated two separate teams for daytime and evening care that could specialize in different skillsets. (*Id.*) Plaintiff's three-nurse team would operate on a rotating schedule with each nurse working two 16-hour shifts and one 8-hour shift for three consecutive days. (*Id.* at 4.) The shifts would be scheduled from 12 a.m. to 8 a.m. and 4 p.m. to 12 a.m. (*Id.*) The change was set to take effect on December 29, 2019. (*Id.* at 3.)

On December 12, 2019, Plaintiff asked for an accommodation to work 12- or 14-hour shifts because, due to her disabilities, she could not work the new 16-hour shifts. (*Id.* at 4; PSOF Doc. 42-2 at 22.) Plaintiff previously underwent amputation of her right foot and retinal detachment surgery. (PSOF Doc. 42-2 at 7–8.) She informed Defendant via email that the new hours would impede circulation in her foot and impact her medical appointments because Plaintiff also needed injections in her eyes every six weeks. (DSOF Doc. 35 at 4.) When Defendant requested more information, Plaintiff provided a doctor's note dated December 26, 2019. (*Id.*) The note read:

> Activity is restricted as follows: EMPLOYEE MAY CONTINUE TO WORK 12HR SHIFTS ON WEEKENDS, WORKING FROM HOME. NO STANDING FOR MORE THAN 25MINS. NO WALKING FOR MORE THAN 25FT. NO DRIVING FOR MORE THAN 25MILES.

(*Id.* a 4–5; Doc. 35-1 at 104.)

On December 31, 2019, Banner's Senior Employee Relations Consultant, Shelly Vento, emailed to set up a meeting with Plaintiff, Plaintiff's supervisor, Deb Vincent, and Banner's RN Senior Post Acute Director, Kim Lane. (Doc. 35 at 5.) Plaintiff responded saying she had "provided all the documentation that HR required" and "already had a

dialogue with leadership" where Vincent told her it was impossible to change the schedule. (Doc. 35-1 at 110.) Vento reiterated that "[t]he accommodation process is a partnership" and she "need[ed] [Plaintiff's] input, [Plaintiff's] collaboration, and willingness to participate in the ADA interactive process." (*Id.*) Vento explained "[t]his is the process where you suggest what accommodations you need and we work, together, to find the reasonable accommodations that enable you to perform your job." (*Id.*) On January 10, 2020, Vento again emailed Plaintiff, along with Vincent and ADA Specialist, Pama Farmer, to schedule the meeting. (*Id.* at 114.) She also outlined a few other job options as well as suggesting Plaintiff could use leave for medical appointments. (Doc. 42-2 at 35.) Vento then reminded Plaintiff about the accommodations meeting and clarified that the meeting was where they would "review and discuss reasonable accommodations." (*Id.*)

On January 17, 2020, Plaintiff met with Vincent and Farmer to discuss her restrictions and potential accommodations. (Doc. 35 at 5–6; Doc. 35-1 at 120.) Plaintiff asked for her old schedule because she was worried the new schedule might interfere with her medical appointments. (*Id.* at 5; Doc. 35-1 at 120.) Vincent explained that they could not keep the old schedule because it would require Defendant to hire an additional full-time employee. (Doc. 35-1 at 120.) Vincent and Farmer told Plaintiff she could use paid sick time or a leave of absence for any medical appointments scheduled during her shift. (Doc. 35 at 5.) Plaintiff also told them that she could not sit at her desk too long. (*Id.* at 6.) Farmer offered a headset for added mobility, but Plaintiff explained that she used two phones at home and could not utilize a headset. (Doc. 35-1 at 120.) Plaintiff gave Defendant another doctor's note, dated January 17, 2020. (Doc. 35 at 6.) It read, "No work over 12 hrs to avoid a re-injury and allow proper healing." (Doc. 35-1 at 124.)

On January 22, 2020, Farmer explained to Plaintiff via email that Banner could not accommodate her schedule request, but it would continue "exploring other possibilities that work with [her] restrictions." (*Id.* at 116.) Farmer informed Plaintiff that she could pursue an available RN Triage position at Banner's Mesa Corp Center or, alternatively, take light duty for 60 days while they worked to find another replacement position. (*Id.* at 117.) On January 23, 2020, Plaintiff replied to Farmer saying she wanted to stay in her position

rather than explore the RN Triage role. (*Id.* at 125.) Farmer then explained that Banner could not allow Plaintiff to continue in her Registered Nurse Home Triage position because her doctors' notes limited her to working 12 hours, and Banner could no longer accommodate a 12-hour shift for this position due to its changing business needs. (*Id.*) Plaintiff signed an Accommodation Worksheet, dated January 24, 2020, acknowledging that Defendant could not provide 12-hour shifts in her current role and would therefore be "[m]oving forward with placement to explore other opportunities that work with [Plaintiff's] restrictions." (*Id.* at 131.)

On January 30, 2020, Plaintiff filed a Charge of Discrimination with the Arizona Civil Rights Division and the Equal Employment Opportunity Commission ("EEOC Charge"). (Doc. 35-1 at 132.) She checked boxes for disability discrimination and retaliation. (*Id.*) Plaintiff alleged that she has "several disabilities" and had "been subjected to discrimination, denied reasonable accommodations, and am now being pushed out of my current job due to my disabilities and in retaliation for my accommodation requests . . . ." (*Id.*)

On February 10, 2020, Farmer emailed Plaintiff, introducing her to Placement Coordinator, Dorina Stookey, to assist her in finding a suitable replacement position. (*Id.* at 144.) Farmer suggested a few initial options. (*Id.*) First, she spoke again about the RN Triage position. (*Id.*) Farmer explained that, after orientation, Plaintiff could work 8- or 10-hour shifts with self-scheduling every other weekend, but Plaintiff had trouble with driving to Mesa for training. (*Id.*) Farmer also spoke about another RN Triage position at Banner University Medical Center Tucson North Campus ("North Campus"), but Plaintiff expressed concern that it would require too much walking in the facility. (*Id.*) Finally, Farmer discussed an in-office position as a RN Clinical Referral Specialist in Mesa. (*Id.*)

On February 13, 2020, Stookey emailed Plaintiff identifying a possible position in medical management that would work with Plaintiff's requirements. (*Id.* at 143.) Stookey said she would put the position on hold for Plaintiff and set up a meet and greet. (*Id.*) Plaintiff agreed to pursue this position in Tucson. (*Id.*) It is not clear what became of this position.

Stookey also gave Plaintiff a copy of the Team Member Guide to Banner's Placement Process. (Doc. 355 at 8; Doc. 35-1 at 151.) The guide outlined that an employee should work with the coordinator to review possible positions and, "[i]f at the end of **60 calendar days** the team member has not been placed, employment may be terminated effective **4/10/2020**." (Doc. 35-1 at 151–52.) The guide further notified Plaintiff that Defendant was not required to promote her as a reasonable accommodation, but she was welcome to apply to promotional positions separately. (*Id.* at 151.)

Defendant did not terminate Plaintiff on April 10, 2020. (Doc. 35 at 8.) Instead, Plaintiff and Banner continued to engage in the interactive process and on May 3, 2020 Defendant placed Plaintiff in a role as "RN Pt Placement Rep," an in-person nighttime position at North Campus in Tucson. (Doc. 35-1 at 146–47.) As an accommodation, Defendant provided for wheelchair transport and assistance to and from the parking lot. (*Id.* at 147.) Plaintiff was given a number to call approximately 30 minutes before arrival and departure. (*Id.*)

Stookey checked in via email with Plaintiff on May 5, 2020. (*Id.* at 148.) Plaintiff replied that "things are moving smoothly as far as the transportation." (*Id.*) However, Plaintiff flagged some challenges with the system, such as initially not being permitted to enter a certain entrance or having to walk in certain areas. (*Id.*) Plaintiff asked "that [she] be allowed to be picked up right in front of the concierge of Tower 1 and exit through the entrance of Tower 1 which is wheelchair accessible and wider and spacious to allow to walk to my car on the visitor's parking lot." (*Id.*) It is not clear from the record whether Defendant responded to this request prior to Plaintiff's next email on May 11, 2020, in which she told Stookey:

> I just want to inform you that the process of transporters taking me to rm 4506 has failed on numerous occasions. I got to work at 1750 and placed a call to be picked up in the lobby of tower 1. That dept was so short staffed that a co-worker from my rm had to once again wheel me upstairs after 45mins. They(3) [sic] were complaining of the set-up and deem it inappropriate. I also feel the same way…especially when I try to get there on time. This should not be a quick/temporary fix.

- 5 -

> My foot is rather a permanent condition. I would like to be replaced in another position that is conducive or appropriate for my restrictions, and with some sense of independence. Effective today 5.11.20.

(*Id.* at 150.) Stookey responded apologizing for the difficulty and asking Plaintiff to allow her an opportunity to solve the issue with transportation. (*Id.*) There is no indication in the record that Plaintiff replied. Plaintiff later testified that it was her understanding that this position would be something she could do from home and later realized it was not. (*Id.* at 57.) However, she said that she would have been willing to return to it if "they could transport me there effectively, not having to wait on people, waiting on my co-workers to take me down or bring me up." (*Id.*) Plaintiff worked three or four shifts in this position before she asked to be put back into the placement process. (*Id.* at 57, 191.)

On June 5, 2020, Plaintiff emailed Banner Human Resources Representative, Jaime Barrette, to ask about two possible positions. (*Id.* at 153.) Barrette replied within the week saying that one of the positions could not be a work from home job, and the other was a full-time position that allowed the employee to work from home 50 percent of the time after six months. (*Id.*)

On June 16, 2020, Barrette told Plaintiff she was approved for light duty from June 17, 2020 to July 16, 2020. (*Id.* at 154.) Barrette explained that the "light duty coordinators will try to find you an assignment during this time within your current restrictions on file. Also, during this time we will continue with our job placement process." (*Id.*) Barrette suggested Plaintiff continue to search for jobs for which she was qualified. (*Id.*) On July 18, 2020, Plaintiff asked why she had only been given 30 days of light duty. (*Id.* at 155.) Plaintiff also said she would "like to give this position which is in MESA . . . a try." (*Id.*) Plaintiff noted that the position was an in-person desk job three days a week and asked for a meet and greet. (*Id.*) Barrette emailed her back asking Plaintiff to call her. (*Id.*) No other correspondence on this topic is included in the record but Plaintiff testified that Defendant extended her light duty for another 30 days. (*Id.* at 62–63.) She also testified that this position in Mesa "required emergency room experience" and "the bathroom was far away."

(*Id.* at 62.)

On July 26, 2020, Plaintiff emailed Barrette asking about a position and Barrette sent her the minimum qualifications, explaining that this position was a promotional opportunity that Plaintiff was welcome to apply for separate from the placement process. (*Id.* at 63.) Plaintiff applied via Banner's website for a chart review position, but the position had already been filled. (*Id.* at 64.)

A month later, on August 27, 2020, Defendant terminated Plaintiff's employment. (Doc. 35 at 10.) Defendant said that neither it nor Plaintiff had found a position for which Plaintiff was qualified that met her restrictions. (Doc. 35-1 at 65.) Plaintiff testified that she could not find a position within Banner because "[m]ost of the jobs were frozen, and even the remote ones had already been filled with people that could—you know, able-bodied people—so there was really nothing." (*Id.*) Between June 18, 2020 and August 26, 2020, Plaintiff applied for four positions at Banner. (PSOF Doc. 42-2 at 82–114; Doc. 42 at 27.) She was interviewed for one of these positions but was not ultimately hired. (Doc. 42 at 27.) Plaintiff did not hear anything about one of the positions and heard that someone else had been hired for the other two. (*Id.*) These jobs were in addition to the two positions she inquired after with the coordinators, one of which was a promotion and the other was deemed unworkable because of the walking. (*Id.*)

On October 5, 2020, Plaintiff filed another EEOC Charge, checking the boxes for disability discrimination and retaliation. (Doc. 35-1 at 156.) Plaintiff alleged:

> After filing my charge in January 2020, I was assigned to work with an ADA coordinator – Human Resources (HR) representative Dorina Stookey – and was told that I had until April 2020 to find a new position or I would be discharged from employment. In May 2020 I identified a position for which I was qualified, and was placed in that position. However, this new position proved unworkable for me as it required considerable walking to get to my assigned office and my disability made this difficult. I again asked for an accommodation; in July my employer placed me in a light duty position but told me I could only keep that position for 60 days. On or around August 27, 2020 I was notified by HR representative Jamie Barrett that 'you can continue looking for

> a job on your own' and that my employment was being terminated. I believe that I was denied a reasonable accommodation for a disability and discharged from employment due to my disability and in retaliation for filing a charge of discrimination . . . .

(*Id.* at 156–57.)

On January 24, 2022, Plaintiff filed her Complaint. (Doc. 1.) Claim One alleges that Defendant violated Arizona paid sick time laws A.R.S. §§ 23-371, *et seq.* when it terminated her "for use of paid medical leave or anticipated need for such leave." (*Id.* at 5.) Claim Two alleges that Defendant violated the Americans with Disabilities Act ("ADA") because "Defendant failed to reasonably engage in the interactive process; and failed to accommodate Plaintiff, and ultimately terminated Plaintiff." (*Id.* at 6.) She avers "Defendant has engaged in direct discrimination against Plaintiff, as well as treating her disparately from other non-disabled workers . . . ." (*Id.*) In her third claim, Plaintiff alleges that Defendant retaliated against her "by taking several adverse actions as described herein" in violation of the ADA. (*Id.*)

## II.  Summary Judgment Standard of Review

A court may grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). An issue is genuine when the disputed facts "could reasonably be resolved in favor of either party." *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). A disputed fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of establishing there is no genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. At that point, the burden shifts to the non-moving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A party's bare assertions are not enough to create a genuine

issue of material fact that will defeat summary judgment. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248; *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("[A]n employee's subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact."). A court at summary judgment is not tasked with weighing the evidence or determining the truth but only determining whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

### III. Discussion

#### A. Discrimination Claim

First, Defendant argues that Plaintiff's discrimination claim fails as a matter of law because "Banner met its obligations under the ADA and is not liable for failing to accommodate Plaintiff." (Doc. 34 at 13.) Defendant claims once Banner learned that Plaintiff could not work shifts longer than 12 hours, it could no longer retain her in the Registered Nurse Home Triage position, even if its business needs permitted returning to the old schedule. (*See id.* at 13–14.) Defendant outlines the steps Banner took to engage in the interactive process and offer reasonable accommodations, including:

> (1) recommending a headset for Plaintiff to help her avoid discomfort from prolonged sitting, (2) advising Plaintiff she was permitted to use paid and unpaid leave for scheduling needs, and (3) informing Plaintiff she could be accommodated by participating in Banner's placement process to locate a replacement position for which she was qualified that met her restrictions.

(*Id.* at 14.) Banner also emphasizes that it placed Plaintiff in a position in May 2020 and provided a transportation accommodation, but she soon left the job despite saying things had been "moving smoothly." (*Id.*) Therefore, Defendant argues that because "Plaintiff rebuffed the interactive process and rejected the transportation accommodation that Banner was providing her . . ." she "lost her status as a qualified individual with a disability and Banner cannot be held liable for Plaintiff's abrupt refusal to continue with the interactive process." (*Id.*) Furthermore, Defendant asserts that Banner was not obligated to promote Plaintiff or employ her indefinitely after months of searching for a new position. (*Id.* at

15.)

Plaintiff responds that a "no exceptions" policy, like the one Plaintiff claims Banner imposed regarding the schedule, "is a form of direct discrimination against the disabled" because it equates to a failure to engage in the interactive process in good faith. (*See* Doc. 41 at 4.) Similarly, Plaintiff asserts that Banner's apparent policy of terminating employees after 60 days of light duty without finding another position is indicia of discrimination. (*Id.* at 5.) Plaintiff argues "Banner has not shown anything but the bare conclusion that such an accommodation (either a schedule change or an extension opportunity for Ms. Tannor to find another job at Banner) was unworkable or an 'undue' burden." (*Id.*) Plaintiff also claims that Banner offered the old triage nurse schedule to another employee after denying Plaintiff that accommodation. (*Id.* at 4–5.) Plaintiff avers that another nurse said Banner "approached [Plaintiff's] former co-worker . . . and offered her the old schedule – the same schedule that [Plaintiff] asked for." (Doc. 42-2 at 3.) Plaintiff asserts Banner had "clearly made up [their mind] in advance" of meeting with Plaintiff and decided that Plaintiff was "just not worth accommodating." (Doc. 41 at 6.)

### 1. Applicable Law

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . and other terms, conditions, or privileges of employment." 42 U.S.C. § 12112(a). If there is no evidence of direct discrimination, the court applies the burden shifting test outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). *See Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) (applying Title VII analysis to ADA claim of discrimination). Under this test, the plaintiff must first establish a prima facie case of discrimination. *Id.* at 802. The degree of proof necessary to establish a prima facie case at summary judgment is minimal. *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094 (9th Cir. 2005) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994); *Aragon v. Republic Silver State Disposal, Inc.*, 292 F.3d 654, 659–60 (9th Cir. 2002)).

The burden then shifts to the defendant to put forth legitimate, nondiscriminatory

reasons for the challenged action. *McDonnell Douglas Corp.*, 411 U.S. at 802. At that point, "any presumption that the defendant discriminated 'drops from the case,' and the plaintiff must then show that the defendant's alleged reason . . . was merely a pretext for discrimination." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 743 (9th Cir. 2004). The plaintiff must provide specific and substantial proof that the defendant's proffered reasons are not only false but also that discrimination was the true motive. *See Zelaya v. Coca-Cola Co.*, 158 F. App'x 809, 811 (9th Cir. 2005) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)); *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

A plaintiff seeking to establish a prima facie case of discrimination based on disparate treatment must establish she "(1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of her disability." *Snead*, 237 F.3d at 1087. An employer also impermissibly discriminates against a disabled employee by "not making reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ." 42 U.S.C. § 12112(b)(5)(A). A prima facie case for this failure to accommodate requires the plaintiff to establish "(1) she is disabled within the meaning of the ADA; (2) she is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) she suffered an adverse employment action because of her disability." *Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (quoting *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003)).

Once the employer learns of the employee's disability, it has a duty to engage in the "interactive process" to identify a reasonable accommodation. *See Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 799 (9th Cir. 2017); *Barnett v. U.S. Airways, Inc.*, 228 F.3d 1105, 1114–15 (9th Cir. 2000), *vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). The interactive process "requires communication and good-faith exploration of possible accommodations between employers and individual employees." *Barnett*, 228 F.3d at 1114. An employer can show it acted in good faith by "point[ing] to cooperative behavior which promotes the identification of an appropriate accommodation."

*Id.* at 1115. Accordingly, ["e]mployers should 'meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome.'" *Id.* (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999)).

A reasonable accommodation is intended to "remove barriers or provide assistance to disabled individuals so that they can perform the 'essential functions' of employment positions." *Cripe v. City of San Jose*, 261 F.3d 877, 889 (9th Cir. 2001). These may include:

> making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. §§ 12111(9)(A)–(B). However, employers are not required to offer accommodations that impose undue hardship on the business. *Quinones v. Potter*, 661 F. Supp. 2d 1105, 1123 (D. Ariz. 2009) (citing *Cripe*, 261 F.3d at 889). The term "[u]ndue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business." *US E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1058 (E.D. Cal. July 13, 2015) (quoting *Weaving v. City of Hillsboro*, No. 10–CV–1432–HZ, 2012 WL 526425, at *17 (D. Or. Feb. 16, 2012)); *see also* 42 U.S.C. §§ 12111(10)(A)–(B) (outlining factors for undue hardship). "An employer does not fail to engage in [the interactive] process by failing to offer an unreasonable accommodation." *Cooper v. Dignity Health*, 438 F. Supp. 3d 1002, 1013 (D. Ariz. 2020) (citing *Moore v. Comp. Assoc. Int'l, Inc.*, 653 F. Supp. 2d 955, 964 (D. Ariz. 2009)) (employees are entitled to reasonable accommodations, not necessarily the accommodation of her choosing).

### 2. Application

Here, Plaintiff asserts that her claim of discrimination includes both disparate treatment and failure to accommodate. (Doc. 41 at 3.) The Court finds that Plaintiff has met the minimal burden at summary judgment of showing a prima facie case of discrimination on both of these grounds. However, Plaintiff has not presented specific or substantial evidence that Banner's stated reasons for (a) not allowing Plaintiff to maintain her old schedule as an accommodation, (b) removing Plaintiff from her position and putting her in the placement process, and (c) ultimately terminating Plaintiff's employment were pretextual.[1]

It is undisputed that Plaintiff provided Banner with two doctor's notes outlining limitations linked to her disabilities. Plaintiff claims Banner misread the restrictions, giving itself a pretext to discriminate. Specifically, Plaintiff asserts that the first note did not *limit* her to 12-hour shifts but only supported her desire to continue working her schedule with 12- and 15-hour shifts. Even if a fact finder could reasonably conclude that Plaintiff's interpretation of the first doctor's note is correct, the second note does not leave the same ambiguity. It clearly stated that Plaintiff's limitations were: "No work over 12 hrs to avoid a re-injury and allow proper healing." Plaintiff does not dispute that she gave this note to Banner dated January 17, 2020—the same date of her accommodations meeting with Farmer and Vincent. Nor does she claim that Banner ultimately refused her schedule accommodation and removed her from the Registered Nurse Home Triage position *before* receiving this note. It was not until January 22, 2020 and January 23, 2020 that Farmer definitively stated Banner could not give her the old schedule and could not allow her to

---

[1] Plaintiff alleges in her Response to Defendant's Motion for Summary Judgment that no burden-shifting analysis is required because Plaintiff was a victim of direct discrimination when Banner "clearly made up" its mind to deny Plaintiff her requested schedule before the accommodation meeting. (Doc. 41 at 6.) Plaintiff offers no evidence of direct discrimination. She relies on Vento's January 10 email where she lists possible job options prior to the accommodations meeting. (*Id.*) But this is not evidence of direct discrimination nor a "blanket" policy to deny Plaintiff accommodations. Indeed, the purpose of the email was to invite Plaintiff to a meeting to review and discuss possible accommodations. Plaintiff's mere allegation of direct discrimination cannot support a claim that survives summary judgment. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 248; *Bradley*, 104 F.3d at 270. Accordingly, the Court will assess her claim through a burden shifting framework based on the circumstantial evidence she offers.

- 13 -

continue in her current position because her doctor's notes made it impossible for her to work the 16-hour shifts now required for the triage team. The facts viewed in the light most favorable to Plaintiff show that Banner could neither grant Plaintiff's schedule accommodation request nor keep her in the Registered Nurse Home Triage position because Banner had legitimate reason to believe Plaintiff could not work more than 12 hours at a time. It is irrelevant if Banner offered a former employee Plaintiff's old schedule because Plaintiff still would not have been able to work a 15-hour shift according to her stated medical limitations.

Plaintiff also does not substantively dispute that Banner's business needs required a schedule change. Plaintiff only emphasizes that some nurses opined it was possible to meet the new business needs with the old schedule and that she heard Banner offered her old schedule to another former employee. It is reasonable that needing to hire an additional employee to cover shifts so that Plaintiff could work her old schedule could constitute an undue burden. Moreover, if true, these facts do not change Plaintiff's individual limitations that the Court detailed above. Plaintiff has not, therefore, provided specific or substantial proof that Banner's stated reason for changing the schedules was false or that discrimination was its true motive.

Furthermore, there is no genuine dispute that Banner engaged in good faith in the interactive process with Plaintiff to identify reasonable accommodations to keep her employed before terminating her. Although Plaintiff asserts Banner imposed a "no exceptions" policy, the email provided by both parties demonstrate that Banner communicated consistently and directly to collaborate with Plaintiff from the moment she requested an accommodation for the new triage schedule. Banner promptly requested more information and, after receiving the first doctor's note, scheduled an accommodations meeting with Plaintiff, specifically emphasizing that the interactive process was a partnership for which it needed Plaintiff's participation. At the meeting, Banner suggested initial solutions like paid sick time or leaves of absence so Plaintiff could attend her medical appointments. Banner also offered Plaintiff a headset so she could walk around rather than sit for long periods of time. Furthermore, Banner identified some initial alternative

positions for Plaintiff and offered her light duty. It appears Banner did consider Plaintiff's requested schedule but found it could not grant her request because it would have to hire an additional full time employee to cover the shifts.

Later, Banner introduced Plaintiff to a Placement Coordinator and outlined the placement process. Stookey and Plaintiff exchanged several emails regarding possible alternative positions at Banner, some of which Plaintiff applied to. Banner even placed Plaintiff in a new position with the accommodation that Banner would provide Plaintiff wheelchair transportation from the parking lot to her desk. After eight days, Plaintiff resigned from that position, saying the transportation was not workable. Banner offered to try to fix the issues with transportation but Plaintiff declined. The undisputed evidence shows that Banner worked with Plaintiff to find reasonable alternatives to termination. Unfortunately, Plaintiff cannot overcome these facts merely by asserting she was entitled to the accommodation she requested or to more time to locate a position.

Additionally, Plaintiff does not dispute that she was on notice that she could be terminated after April 10, 2020 if the placement process failed to locate a new position for her. Even if that policy tended to indicate discriminatory conduct as Plaintiff argues, Banner did not apply that policy to Plaintiff and did not terminate Plaintiff until August, four months after it could have terminated her and eight months after it began engaging in the interactive process to find a suitable placement and/or accommodation for Plaintiff. Plaintiff has not shown that Banner's compliance with its policy, in combination with employing Plaintiff for an additional four months, is merely pretext and not a legitimate, nondiscriminatory basis for terminating her employment.

Accordingly, the Court finds that there is no genuine dispute of material fact regarding Plaintiff's claim of disability discrimination and Defendant is entitled to summary judgment on this claim.

### B. Retaliation Claim

Defendant next argues that Plaintiff's retaliation claim fails as a matter of law because Banner had legitimate reasons for its actions allegedly in retaliation for Plaintiff requesting a schedule accommodation and filing her EEOC Charge. (Doc. 34 at 16.)

Specifically, these actions include (1) denying Plaintiff's accommodation request to return to her old schedule, (2) removing her from the Registered Nurse Home Triage position, and (3) terminating her employment. (*Id.*) Defendant again asserts that its business needs along with Plaintiff's limitations made it impossible to grant her schedule request or keep her in the triage position with the new schedule. (*Id.*) Furthermore, Defendant highlights that it made the schedule changes *before* Plaintiff requested an accommodation or filed her first EEOC Charge. (*Id.*) Thus, Defendant contends, the schedule change was not related to Plaintiff's protected activities. (*Id.*) Finally, Defendant argues that Banner did not terminate Plaintiff until August 27, 2020, nearly eight months from when she requested her accommodation and seven months after she filed her EEOC Charge. (*Id.* at 17.)

Plaintiff responds that, after she requested an accommodation and filed her EEOC Charge, Banner, and its in-house counsel, "set in motion the termination plan designed to appear compliant with, and give lip service to, the ADA; but in actuality end Plaintiff's employment." (Doc. 41 at 6.) Plaintiff first notes that she referenced previous EEOC proceedings back in December 2019 when she first requested the accommodation. (*Id.* at 9.) She then asserts that Banner's discussion about losing her job, even before the accommodation meeting, was retaliatory. (*Id.*) Plaintiff also argues Banner retaliated against her when it removed her from the Registered Nurse Home Triage position and that Banner "misread[]" her doctor's note limiting her to 12-hour shifts. (*Id.*) Plaintiff claims Banner failed to inform her of at least one possible position and categorized other jobs as promotions without explanation. (*Id.*) "[T]he ultimate adverse action in retaliation," Plaintiff argues, occurred when Banner fired her "and coded her as 'unavailable for work' – ostensibly because her '60 days' of light duty was up and she had not located another job despite multiple applications." (*Id.* at 9–10.) Plaintiff also highlights that the same personnel, namely Vincent and Stookey, who were aware of or involved in the EEOC Charges were also in charge of coordinating new placement for Plaintiff and this suggests Defendant's actions were retaliatory. (*Id.*)

### 1. Applicable Law

A claim that an employer unlawfully retaliated against a disabled employee for

engaging in protected activity can be demonstrated through indirect evidence and is assessed through the burden-shifting framework. *See Brown v. City of Tucson*, 336 F.3d 1181, 1186–87 (9th Cir. 2003). "To state a prima facie case of retaliation, a plaintiff must show that: (1) she was engaging in a protected activity, (2) the employer subjected her to an adverse employment action, and (3) there was a causal link between the protected activity and the employer's action." *Xin Liu v. Amway Corp.,* 347 F.3d 1125, 1144 (9th Cir. 2003). Actions to pursue one's rights under the ADA, like requesting an accommodation or filing a charge of discrimination, constitute a protected activity for purposes of a retaliation claim. *See Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004). An adverse employment action is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242–43 (9th Cir. 2000) (quoting Equal Employment Opportunity Commission Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998)). To establish causation, the plaintiff must prove "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).

### 2. Application

Here, the Court finds that Plaintiff has presented a prima facie case of retaliation based on Banner's actions removing Plaintiff from her triage role and terminating her employment.[2] Plaintiff requested a schedule accommodation and filed an EEOC Charge, both of which constitute protected activities under the ADA. Banner does not dispute that it was aware of her activities. Although the casual link between these activities and Banner's actions is tenuous, the burden at summary judgment is minimal.

Nonetheless, Plaintiff has again failed to put forth specific or substantial proof that

---

[2] Plaintiff cannot establish a prima facie case of retaliation based on Banner changing her schedule and denying her accommodation request to return to her old schedule because this occurred before Plaintiff filed her EEOC Charge. Plaintiff's assertions that she referenced charges from prior years cannot support a claim of retaliation based on a subsequent charge. Furthermore, as detailed in the previous section, Banner had legitimate nondiscriminatory reasons for denying the schedule accommodation request and Plaintiff did not put forth proof that these reasons (business needs and reliance on her doctor's note) were pretextual.

- 17 -

the reasons Banner put her in the placement process and terminated her were false or pretext for a true discriminatory motive. As the Court detailed above, there were legitimate and nondiscriminatory reasons for each of these actions. Banner reasonably relied on Plaintiff's stated medical limitations and there is no genuine dispute that the second doctor's note prevented Plaintiff from working the triage hours, requiring Banner to seek other positions for her through the placement process. Any discussion of Plaintiff losing her job as a Registered Nurse Home Triage prior to the accommodations meetings was not in and of itself retaliatory because that determination was not ultimately made until after such meeting and in reliance on information Plaintiff provided. And Banner terminated her employment long after Plaintiff requested her accommodation and filed the EEOC Charge, and after months of the interactive process including one placement that Plaintiff rejected without permitting Banner to address the challenges.

Furthermore, Banner worked with Plaintiff to consider several positions, but was not required to offer Plaintiff a promotion or place her in the specific job she wanted as a reasonable accommodation or to overcome the presumption of retaliation. Although Plaintiff argues that Banner categorized a job as promotional without any explanation, Plaintiff has not explained why this would be pretext or why the job was not in fact promotional. Banner also told Plaintiff she was welcome to apply for any promotional position if she met the minimum qualifications.

Finally, Plaintiff relies on the fact that Vincent, Plaintiff's supervisor, and Banner's in-house counsel were included in the communications or involved in the placement process to argue that Banner's true motive was retaliation for Plaintiff requesting an accommodation and filing discrimination charges. But ultimately these were not the only individuals participating in the placement process with Plaintiff and there is no evidence to suggest they were in charge of the accommodations meeting or made the final decisions to remove Plaintiff from her triage position or terminate her employment. In other words, their involvement and knowledge of Plaintiff's discrimination charge do not constitute specific or substantial proof of pretext.

Accordingly, even viewing the facts in the light most favorable to Plaintiff, the

Court cannot find that there is a genuine dispute of material fact regarding Plaintiff's retaliation claim that allows it to survive summary judgment.

### C. Arizona Paid Sick Time

Finally, Defendant asserts Plaintiff's claim under state law fails because Plaintiff "testified that she did not take PTO or sick time and was 'unaware' if PTO or sick time played any role in Banner's decision to terminate her employment." (*Id.*) Defendant further emphasizes that "Plaintiff did not use any sick time in the ninety days before she was terminated" and Banner has shown it had legitimate reasons for terminating Plaintiff that were unrelated to her use of sick time. (*Id.*)

In response, Plaintiff argues that "Defendant's HR personnel raised the specter of paid sick time twice . . . However, once Plaintiff forwarded a copy of her 2016 attorney demand letter on January 22, 2020 . . . Defendant never again mentioned that Ms. Tannor could use sick time to cover absences." (*Id.* at 11.) Instead, Plaintiff claims Banner "bled off" Plaintiff's entire sick time balance after it removed her from the position of Registered Nurse Home Triage. (*Id.*) Defendant then put her on light duty, Plaintiff argues, to make it so that Plaintiff would not have used any sick time within 90 days of being terminated as to avoid liability under Arizona law. (*Id.*)

The Court, in its discretion, declines to exercise supplemental jurisdiction over Plaintiff's state law claims. *Smith v. Lenches*, 263 F.3d 972, 977 (9th Cir. 2001) (citing *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 172–73 (1997)) ("[D]istrict courts may decline to exercise jurisdiction over supplemental state law claims in the interest of judicial economy, convenience, fairness and comity.").

///
///
///
///
///
///
///

### IV. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**. (Doc. 34.) The Clerk of Court shall docket accordingly and close the case file in this matter.

Dated this 7th day of August, 2023.

_____
Honorable Raner C. Collins
Senior United States District Judge